### 23162.   ARRINGTON *v.* THE STATE.

DECIDED NOVEMBER 27, 1933.

*M. B. Eubanks,* for plaintiff in error.

*James F. Kelly, solicitor-general, Barry Wright, Porter & Mebane,* contra.

MacINTYRE, J.   The indictment in this case charges that on December 5, 1932, in Floyd county, Georgia, A. B. Arrington did "forcibly, unlawfully and fraudulently lead, take, and carry away, and did then and there decoy and entice away one John Berry Turbidy, a male child of the age of four years and under the age of eighteen years, from his parent, J. L. Turbidy, against the will of, and without the consent of, the said J. L. Turbidy." The verdict was: "Guilty of attempt to kidnap, min. 4 yrs. max. 4 yrs." The exception is to the judgment overruling the motion for a new trial.

In special ground 1 of the motion for a new trial complaint is made of the following charge of the court: "I charge you that under the evidence in this case the offense of kidnapping was not committed, but I charge you under the evidence that the defendant might be convicted of the offense of attempting to kidnap." The assignment of error is that in giving this charge the court expressed an opinion that while the evidence "was not sufficient to convict him of kidnapping, it was sufficient to authorize a verdict of guilty of attempting to kidnap." Immediately following the charge quoted the court said: "Consequently, I give you in charge section 1086;" this being the section dealing with the offense of an attempt to commit a crime.   Immediately after charging said code section, the court charged the jury as follows: "So, you look to the evidence in this case and apply it to these rules of law, and you determine the guilt or innocence of this defendant.   You determine as to whether or not, within four years prior to the return of this bill, the defendant did attempt the offense of kidnapping.   You determine as to whether or not he did any act towards the commission of such offense, or tried or failed in the commission thereof, or was aiding or abetting in the commission of the same.   If you find that he did, and find it beyond a reasonable doubt as to his guilt, it would be your duty to convict him.   If you find that he did not, or if you have a reasonable doubt as to his guilt, it would be your duty to acquit him.   So, you look to the evidence in this case and apply it to these rules of law, and you determine the guilt or innocence of this defendant.   As stated, you could not convict the defendant of the offense charged in the indictment, but, as stated, you might

find him guilty of the offense of an attempt to kidnap." The court also instructed the jury as to the forms of their verdict in the event of a conviction or an acquittal of the attempt to kidnap.

Construed in the light of its context and the charge as a whole, we do not think that the excerpt complained of is subject to the exception taken. To our minds, the court clearly instructed the jury that the defendant could not be guilty of kidnapping, but that he might be convicted or acquitted of an attempt to kidnap, accordingly as the evidence warranted. In *Love* v. *State,* 14 *Ga. App.* 49 (4), where in the charge to the jury the court employed the phrase, "although he might be guilty of stabbing, not in his own defense," this court held that "such an instruction did not amount to an expression of opinion on the facts." We hold that the court did not err in overruling this special ground.

In special ground 2 it is contended that the court committed reversible error in charging the law relative to an attempt to commit a crime, as contained in the Penal Code (1910), § 1066. The assignments of error are: "(a) Said indictment did not allege the offense of attempting to kidnap. (b) That said indictment did not set forth nor allege any act which would constitute such attempt. (c) Because the indictment alleged a completed offense, he was arraigned on that indictment and plead thereto, the jury were selected and sworn thereon, and he was never put on notice in any way of such offense as an attempt to kidnap. (d) Because the court in his charge on the question of an attempt to kidnap did not confine the case to an attempt to kidnap the child named in the indictment, and never once in that part of his charge referred to said child, but the charge as given throughout on the subject of the attempt would have applied to any other child, as much as the one named in the indictment. (e) Because the evidence did not authorize such charge as to this defendant."

We hold that there is no merit in assignments (a), (b), (c), and (e), and in this connection direct attention to *Arrington* v. *State,* (23163), 48 *Ga. App.* (171 S. E. 878), wherein this court held that the trial judge properly overruled a motion in arrest of judgment, made in the same case we are now considering. As to assignment (d) it is hardly necessary to say more than that the indictment charges that one particular, well-described child was kidnapped; that the trial judge read the indictment to the jury in the first para-

graph of his charge; and that there could not have been any possible doubt as to what child the court had reference to when instructing the jury upon an attempt to kidnap. We hold that no assignment of error in special ground 2 is meritorious.

The conviction not being solely dependent upon circumstantial evidence, the court did not err in failing to charge the law of circumstantial evidence, there being no appropriate, written request to do so; and the court properly overruled special ground 3.

Special ground 4, averring that the evidence shows that the father of the child named in the indictment consented to and connived in the alleged act, is merely an amplification of the general grounds, and needs no separate consideration.

Carl Shiftlett, sworn for the State, testified in part as follows: "The first time I heard of it, I was at home. . . It was somewhere around six weeks before the alleged kidnapping. Mr. Arrington came to my house, and with him were Red Spratling and . . Mattie Collier. . . They come out there in a Ford roadster. . . Red Spratling got out and called me . . and told me Mr. Arrington wanted to see me about this kidnapping job, and Mr. Arrington and Red Spratling and I went to the woods. . . When we got there . . Mr. Arrington then went on and explained to me what he wanted pulled, and I told him I wouldn't. . . He told me he would give me $5000, saying he was going to get the $5000 out of John Berry. At that time Shorty Goings wasn't there. They said they would see me later. . . I reported it [the occurrence referred to] to Ben McCollum, Mr. Horton and Mr. Coleman. . . Mr. Arrington said that after they picked the child up—after Buck Walker picked the child up, he would meet them out in the road in the Pierce-Arrow car, and would have food and blankets and milk for the child." Referring to a time when he saw the defendant, Red Spratling, Shorty Goings, and Buck Walker the afternoon before the attempted kidnapping, Shiftlett testified: "Mr. Arrington was trying to explain to Walker how he would pick this child up, and what there would be in it to him. And Arrington asked Walker if he would pick this child up, saying it was John Berry's grandchild. . . He told him that Shorty Goings would be driving the automobile, and for him, Walker, to pick the child up, and that he would be parked up a little down the road somewhere in a Pierce-Arrow automobile with food for the

time being . . with blankets and food stuff—something like that. He told Walker where they would take the child to after they had picked him up, Arrington saying it was just this side of my house, just around the curve in the hollow. Mr. Arrington said he would deliver the child and collect the money. Mr. Arrington said he was going to be up there on the road and they were going to change the child from Shorty Goings' car to his car, a high-powered . . Pierce-Arrow. They were going to take the child out near my house, and, according to Mr. Arrington's proposition, I was supposed to be there on the road and keep the child. . . He [Arrington] told him that there would be about $7500 to him (Walker). He mentioned to Walker . . that he would get the money off of John Berry."

J. L. Turbidy testified, in substance, that he was the father and John Berry the grandfather of John Berry Turbidy; that he had information from the sheriff's office that there was to be an attempt to knidap his son; that witness and officer McCollum concealed themselves in a house near where the child in question and other children were accustomed to congregate; that at about two-thirty o'clock in the afternoon of December 5, 1932, Goings and Walker drove up in a Hudson-sedan automobile and stopped near the side-walk not far from where the children and their nurses were, Goings being under the wheel of the car; that Walker asked which was the Turbidy nurse, and then asked said nurse which was the Turbidy child; that Walker then told the nurse that Mr. Turbidy wanted the child to come over to the mill to get his picture taken; that the child did not want to go, and that when he had one foot on the running-board of the car, Walker "made a grab for him;" that at this time witness and officer Ben McCollum rushed out of the house with drawn weapons; that "the grab failed," and the child was backing away; that Walker made a motion towards his hip pocket, and witness threatened to blow his brains out; that both Goings and Walker were arrested; that witness had not authorized any one to get his child to have his picture taken, or for any other purpose; and that witness had not authorized any one to decoy or entice his child away.

On cross-examination J. L. Turbidy testified in part as follows: "When I ran to the car Shorty Goings was at the wheel, and he said he was the victim of circumstances. . . I was not neces-

sarily expecting Shorty Goings to be in a car there. I don't know it was this sedan. I have found out since it was. Also have found out since it was his Pierce-Arrow. . . I had information at the time I ran out there with my pistol . . that the powder had been taken out of the cartridges in his pistol. . . I had been told he couldn't hurt me. . . I was expecting an effort at least to be made to take that child away from me. I told the nurse to accede to any request they made, and I meant for her to do it."

Deputy sheriff C. J. Harris testified: that he had received information that "the kidnapping would occur at that time," and that, with three other officers, he was in an automobile which had been parked near the scene of the attempted kidnapping; that when Mr. McCollum and Mr. Turbidy came out of the house (in which they had been concealed) "we made a dash right around the corner from East Eleventh street . . one hundred yards, or something like that," and the defendant was sitting in the Pierce-Arrow automobile, "right where he could see every move made at this other car;" that there was found in the Pierce-Arrow car some bread and crackers, two or three bottles of milk, some canned goods, and two quilts; that both the Pierce-Arrow and the Hudson-sedan automobiles belonged to Goings; that witness knew that the powder had been taken out of the pistol that Walker had; that witness had been in conference with Goings, and Goings had told witness where the defendant would be; and that the defendant made no attempt to escape, but that he had no chance to do so.

The gist of the testimony of Mattie Collier was that she did accompany the defendant and Spratling out to see Carl Shiftlett; that the details of the kidnapping were not explained to her; and that the defendant asked her about the kidnapping and she "refused to do it." In his statement to the jury the defendant denied any knowledge of the intended kidnapping.

We are satisfied that we have set out enough of the evidence to show that the jury were warranted in concluding that the defendant was directly implicated in an attempt to kidnap the Turbidy child. However, it is contended by the defendant that he should not have been convicted, because the child's father consented to and connived in the attempted kidnapping. "When one is informed that another intends to commit an offense against him or his property, the law permits him to afford opportunities for its commission

and lay traps which may result in the detection of the offender. To this end he may employ another to act with the intending criminal and be present with him at the time the crime is to be committed; and if the intending criminal does himself acts which would constitute the offense, he will not, when charged with the crime, be protected from punishment by reason of the fact that, at the time the criminal act was performed by him, another, who was there with the knowledge, consent, and approval of the victim and even by his direct employment, aided in and encouraged its perpetration. In such a case, however, it must appear that the person charged with the offense did himself everything necessary to make out a complete offense against the law. Nothing that was done by the person present with the knowledge and consent of the victim will be imputed to the accused; and if, in order to constitute the offense, it is necessary that something done by such person shall be imputed to the accused, then the prosecution will fail. Or, if it appears that the intent to commit the crime did not originate with the accused but was suggested by the person present with him, with the knowledge and approval of the victim, the prosecution will likewise fail." *Dalton* v. *State,* 113 *Ga.* 1037, 1038, 1039. While Goings was present when the attempt to kidnap the child was made, with the consent and approval of the child's father, and actually participated in such attempt, we are satisfied that the jury had the right to conclude from the evidence that, independently of any act of Goings, the defendant himself committed acts which amounted to an attempt to kidnap. We hold that the evidence supports the verdict, and that the trial judge did not err in overruling the motion for a new trial for any reason assigned.

*Judgment affirmed. Broyles, C. J., and Guerry, J., concur.*